**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NORTHWEST COMMUNITY HEALTHCARE )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>)<br>)<br>MORGAN STANLEY INVESTMENT )<br>MANAGEMENT, INC. )<br>) | No. 2010 C<br><br>Plaintiff demands Trial<br>by Jury on all issues<br>triable to a jury |

## COMPLAINT

Plaintiff, Northwest Community Healthcare  hereby states for its Complaint as follows:

## NATURE OF THE ACTION

1.     This is an action against Morgan Stanley Investment Management, Inc., an investment adviser registered with the Securities and Exchange Commission, for violations of the Investment Advisers Act of 1940, fraudulent practices and courses of business by a federal covered investment adviser under the Illinois Securities Law, breaches of contract, breaches of fiduciary duty and negligent misrepresentation.

## THE PARTIES

2.     Plaintiff, Northwest Community Healthcare ("NCH")  is an Illinois corporation. It has its principal place of business in Arlington Heights, Illinois.  It is a citizen of Illinois.

3.     Morgan Stanley Investment Management, Inc. is a Delaware  corporation.  It has its principal place of business in New York, N.Y.  It is a citizen of Delaware and  and New York.

## SUBJECT MATTER JURISDICTION

2.      This Court has subject matter jurisdiction of the federal securities law claims

pursuant to  15 U.S..C Section 80b-14, and 28 U.S.C. Section 1331.

3.      This Court has subject matter jurisdiction of the state and common law claims

pursuant to 28 U.S.C. Section 1332 in that the matters in controversy each exceed the sum of

$75,000 and the parties are citizens of diverse states.

## VENUE

4.      Venue is proper in this District pursuant to 28 U.S.C. Section 1391a(2) and

1391(b)(2) because a substantial part of the events or omissions that gave rise to the claims

occurred here.

## JURY DEMAND

5.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, NCH demands a trial

by jury with respect to all claims brought herein.

## FACTUAL BACKGROUND

### Investment Advisory Relationship

6.      Effective on August 1, 1988, NCH entered into a investment advisory agreement

with Miller, Anderson & Sherrerd.

7.      On August 7, 1995, NCH consented to the assignment of the investment advisory

agreement in connection with the acquisition by a Morgan Stanley affiliate of all the outstanding

partnership interests of Miller, Anderson & Sherrerd.

8.      Since in or about August 1995 through July 1, 2009,  Morgan Stanley Investment

Management, Inc.(MSIM)  provided investment advisory services to NCH pursuant to the

investment advisory agreement entered into with Miller, Anderson & Sherrerd in 1988 and assigned in 1995.

9.     The investment advisory services provided by MSIM were with respect to the fixed income portfolio for the Renewal and Replacement Fund of NCH.

10.     The investment advisory agreement provided that MSIM would exercise its own judgment and discretion in making sales, exchanges, investments or reinvestments, and that its judgment and discretion would be subject to the investment objectives and guidelines of NCH.

## Investment Objectives and Guidelines

11.     The investment objectives and guidelines for the fixed income portfolio were set out in the Statement of Investment Policy for the Renewal and Replacement.  On October 18, 1996, NCH provided MSIM with the Statement of Investment Policy for the Renewal and Replacement Fund.

12.     The investment objectives and guidelines for the fixed income fund managed by MSIM were specified in the Statement of Investment Policy dated October 1996.

13.     The investment objective for the fixed income fund for a time horizon of approximately 1-3 years, was to exceed the Lehman Aggregate Bond Index on an after fee basis.

14.     The investment guidelines prohibited the use of derivatives  to leverage the fixed income portfolio.

15.     Among the responsibilities of MSIM in the Statement of Investment Policy was to promptly inform NCH or its designated agent regarding significant matters pertaining to the investment of the assets of the fixed income fund.

16.     In December 2007, MSIM acknowledged that the investment objective of the fixed income fund was to exceed the return on the Lehman Brothers Aggregate Bond  Index on

an after fee basis, and that derivatives were prohibited from use to leverage the fixed income portfolio.

## Investment in MAS Advisory Portfolio

17.    In September and October 1996, MSIM sought the approval of NCH to utilize units of the MAS Funds Advisory Mortgage Portfolio for the mortgage securities investment component of the fixed income portfolio. The approval of NCH was required because the MAS Funds Advisory Mortgage Portfolio made investments in futures contracts which were prohibited in the Statement of Investment Policy.

18.    The MAS Funds Advisory Mortgage Portfolio was a pooled investment fund for which MSIM served as the investment manager pursuant to an investment advisory agreement.

19.    By letter dated October 18, 1996, NCH authorized MSIM to use the MAS Funds Advisory Mortgage Portfolio for all mortgage related holdings for the fixed income fund managed by MSIM for NCH.

20.    The name of the MAS Funds Advisory Mortgage Portfolio was changed to the Morgan Stanley Institutional Fund Trust's Advisory Portfolio (hereinafter "Mortgage Advisory Portfolio.")

21.    From and after October 1996 through August 2008, MSIM invested the assets of the fixed income portfolio in the Mortgage Advisory Portfolio pursuant to the authority granted to it by NCH in October 1996.

## Mortgage Advisory Portfolio - Investment Losses

22.    During the period from September 30, 2007 through August 12, 2008, when NCH instructed MSIM to liquidate the entire position in the Mortgage Advisory Portfolio, the Net Asset Value of units in the Mortgage Advisory Portfolio declined from 9.19 to 7.10, a

decline of twenty-two percent (22%). During the same period, the mortgage component of the Lehman Brothers Aggregate Bond Index increased slightly in value.

    23.    The following schedule records the NAV of the units at each month-end from September 30, 2007 to July 31, 2008, and at August 12, 2008, the date of liquidation instructed by NCH.

| Month-End | NAV |
|-----------|-----|
| 09/30/07 | 9.29 |
| 10/31/07 | 9.32 |
| 11/30/07 | 9.30 |
| 12/31/07 | 9.15 |
| 01/31/08 | 9.25 |
| 02/29/08 | 8.82 |
| 03/31/08 | 8.24 |
| 04/30/08 | 8.18 |
| 05/31/08 | 8.08 |
| 06/30/08 | 7.66 |
| 07/31/08 | 7.19 |
| 08/14/08 | 7.10 |

    24.    Based on the mark-to-market value of the NCH position in the Mortgage Advisory Portfolio at September 30, 2007, NCH realized a loss of $7,057,918 from its investment in the units. The following schedule records the unrealized losses at each month end from September 30, 2007 through July 31, 2008:

| Month-End | Unrealized Profit/<Loss> |
|-----------|--------------------------|
| 09/30/07 | -0- |
| 10/31/07 | 86,921 |
| 11/30/07 | 29,547 |
| 12/31/07 | <  418,812> |
| 01/31/08 | <  110,836> |
| 02/29/08 | < 1,440,706> |
| 03/31/08 | < 3,407,104> |
| 04/30/08 | < 3,769,875> |
| 05/31/08 | < 3,769,875> |

06/30/08                           < 5,174,511>
07/31/08                           < 6,754,679>

25.    The loss in value of units in the Mortgage Advisory Portfolio was directly caused by the investment of the assets of the Mortgage Advisory Portfolio in a category of investments which were identified as "Other Mortgages" in the quarterly and annual filings made by the Mortgage Advisory Portfolio with the Securities and Exchange Commission. These "Other Mortgages" were materially comprised of non-Agency, Collateralized Mortgage Obligations backed by MTA (moving treasury average) option ARM mortgages of Alt-A borrowers.

### Reporting of "Other Mortgages" Investment as "Cash Equivalent"

26.    MSIM provided NCH with a monthly report of the "Portfolio Detail" and "Asset Composition," among other information, for the fixed income portfolio managed by MSIM.

27.    With respect to the fixed income portfolio investments in "Mortgages, " MSIM reported the investment category as a single-line item in its "Portfolio Detail" report to NCH. The single-line item reported the number of units owned in the Mortgage Advisory Portfolio, the NAV per unit, and the aggregate value of the investment. The following schedule records the value of the investment in the Mortgage Advisory Portfolio and its percentage of the total value of the fixed income assets under management by MSIM.

| Month-End | Value of Units Mort. Adv. Port. | Value of Total Fixed Inc. Assets | Percentage |
|-----------|--------------------------------|----------------------------------|------------|
| 06/30/07 | 28,381,576 | 51,852,016 | 54.7 |
| 08/31/07 | 26,673,305 | 52,429,561 | 50.8 |
| 09/30/07 | 26,919,114 | 52,716,653 | 51.0 |
| 11/30/07 | 27,210,078 | 51,731,797 | 52.5 |
| 12/31/07 | 28,179,855 | 51,429,688 | 54.7 |
| 01/31/08 | 28,487,831 | 52,134,180 | 54.6 |
| 02/29/08 | 27,296,542 | 50,975,304 | 53.5 |
| 03/31/08 | 26,941,983 | 49,151,757 | 54.8 |
| 04/30/08 | 27,059,137 | 49,179,755 | 55.0 |

| | | | |
|---|---|---|---|
| 05/31/08 | 26,876,102 | 48,614,876 | 55.2 |
| 07/31/08 | 24,191,494 | 45,922,408 | 52.6 |

28.     The "Other Mortgages" category of investments in the Mortgage Advisory

Portfolio constituted approximately 50% of the net assets of the Mortgage Advisory Portfolio at

each quarter-end from June 30, 2007 to December 31, 2007. The following records the

aggregate amount of the "Other Mortgages" investment category, the total net assets of the

Mortgage Advisory Portfolio and the percentage of net assets comprised by the "Other

Mortgages" sector.

| Quarter-End | Total "Other Mortgates" | Net Assets | Percentage |
|---|---|---|---|
| 06/30/07 | 1,596,722,000 | 3,171,330,000 | 50.3 |
| 09/30/07 | 1,580,010,000 | 3,228,079,000 | 48.9 |
| 12/31/07 | 1,634,753,000 | 3,291,265,000 | 49.6 |

29.     Until the monthly report for June 30, 2008, in its monthly reporting of the Asset

Composition of the fixed income portfolio, MSIM allocated the separate investments held within

the Mortgage Advisory Portfolio into one or more general categories. These general categories

were "ABS/CMBS" or asset backed securities/commercial mortgage backed securities;

"Mortgages" with subcategories of "Prepayment Sensitive," "Agency Pass-thrus" or "Other

Mortgages;" and "Cash and Equivalents."

30.     In its monthly reporting of Asset Composition for June 30, 2007, MSIM reported

the amount of the "Other Mortgages" investments held in the Mortgage Advisory Portfolio

almost entirely as "Cash and Equivalents."

31.     In its monthly reporting of Asset Composition for September 30, 2007,

MSIM reported a material amount of the "Other Mortgages" investments held in the Mortgage

Advisory Portfolio as "Cash and Equivalents," and failed to include a material amount of the

"Other Mortgages" in any other  category of  the Asset Composition report.

### Failure to Report Material Amounts of "Other Mortgage" Assets

32.     Between September 30, 2007 and December 31, 2007, the composition of the

assets comprising the "Other Mortgages" held in the Mortgage Advisory Portfolio did not change

materially, and the aggregate amount increased from $1,580,010,000  to $1,634,753,000.

Between that same time period, the amount of "Other Mortgages" investments held by the

Mortgage Advisory Portfolio, as a percentage of net assets increased from 48.9% to 49.6%.

33.     In its monthly reporting of the Asset Composition of the NCH fixed income fund

for December 31, 2007, MSIM failed to include a disclosure of a material amount of the "Other

Mortgages" assets in any category of the Asset Composition report.

34.     In its monthly reporting of the Asset Composition of the NCH fixed income fund

for March 31,2008, MSIM failed to include a disclosure of a material amount of the "Other

Mortgages" assets in any category of the Asset Composition report.

35.     In its monthly reporting of the Asset Composition of the NCH fixed income fund

for April 30, 2008 and May 31, 2008, MSIM failed to include disclosure of a material amount of

the "Other Mortgages" assets in any category of the Asset Composition report.

36.     During the period from December 31, 2007 through May 31, 2008,  the "Other

Mortgages" investments held in the Mortgage Advisory Portfolio did not change materially, but

did decline sharply in value.  In the aggregate, this sharp decline in value caused the NAV for

units held by NCH to decline significantly, which caused material losses in the fixed income portfolio of NCH.

### Use of "TBA" Transactions

37.　During the period of time when MSIM failed to disclose the extent to which the Asset Composition of the fixed income fund of NCH was comprised of the non-agency "Other Mortgages" assets held in the Mortgage Advisory Portfolio, MSIM did report that the mortgage position of NCH in the fixed income fund was substantially comprised of "Agency Pass-thru" mortgage securities.

38.　"Agency Pass-thru" mortgage securities were a component of the Lehman Brothers Aggregate Bond Index. "Non-agency" mortgage securities were not a component of the Lehman Brothers Aggregate Bond Index. The "Other Mortgages" investments in the Mortgage Advisory Portfolio were non-agency mortgage securities.

39.　During the period from September 30, 2007 through August 2008, the agency mortgage securities component of the Lehman Brothers Aggregate Bond Index was relatively stable, and far less volatile than the "Other Mortgages" held in the Mortgage Advisory Portfolio. The following compares the NAV for units of the Mortgage Advisory Portfolio to the valuation for an index which mirrored the mortgage component of the Lehman Brothers Aggregate Bond Portfolio.

| Date | Mortgage Advisory Portfolio - NAV | iShare Lehman MBS Bond ETF |
|---|---|---|
| 09/30/07 | 9.29 | 100.29 |
| 10/31/07 | 9.32 | 101.33 |
| 11/30/07 | 9.30 | 102.30 |
| 12/31/07 | 9.15 | 101.80 |
| 01/31/08 | 9.25 | 103.56 |
| 02/29/08 | 8.82 | 103.08 |
| 03/31/08 | 8.24 | 103.32 |

| | | |
|---|---|---|
| 04/30/08 | 8.18 | 103.03 |
| 05/31/08 | 8.08 | 101.85 |
| 06/30/08 | 7.66 | 101.30 |
| 07/31/08 | 7.19 | 101.89 |

40.     The Mortgage Advisory Portfolio acquired interests in "Agency Pass-thru" mortgage securities by utilizing "TBA" transactions, and maintained a  position in new "Agency pass-thru" mortgage securities by engaging in a "TBA Roll" procedure.  In doing so, the Mortgage Advisory Portfolio utilized derivatives which resulted in leveraging the Mortgage Advisory Portfolio.

41.     "TBA" transactions are a form of delayed delivery transactions for the purchase of agency mortgage pass-thru securities.  In a "TBA" transaction, the buyer and seller decide on the general trade parameters such as the government agency issuer, the coupon rate, term to maturity, par amount, price and settlement date.  The actual securities to be delivered are identified shortly before, generally two (2) business days prior to the settlement date.   On the settlement date, the buyer is required to pay for the securities.  In many instances a buyer will engage in a "TBA roll" rather than use other assets to settle the transaction.  In a "TBA roll," the original agency security is sold by the buyer with the proceeds used to settle the purchase obligation.

42.     MSIM knew TBAs were a type of derivative.   MSIM also knew that investment in TBAs might involve a form of leverage.  MSIM also knew that NCH prohibited the use of derivatives to leverage the fixed income portfolio.

43.     The Mortgage Advisory Portfolio utilized TBA transactions to acquire positions in agency pass-thru securities which it paid for through the "TBA roll" procedure.  Utilization of this investment methodology resulted in the Mortgage  Advisory Portfolio having  liabilities in amounts related to the outstanding TBA commitments..

44.     The following schedule records the utilization of TBA transactions to create a
position in agency pass-through securities in the Mortgage Advisory Portfolio.   The Mortgage
Advisory Portfolio did not utilize assets to pay for the TBA commitments.  Instead, the liabilities
were met through the "TBA roll" procedure, with new positions established through successive
"TBA" transactions.

|  | **06/30/07** | **09/30/07** | **12/31/07** |
|---|---|---|---|
| Total TBA Transactions for Agency Pass-thrus | 159,071,000 | 1,004,508,000 | 1,605,078,000 |
| Total Investments | 3,416,120,000 | 4,220,691,000 | 4,953,706,000 |
| Liabilities in Excess of Other Assets | < 244,790,000> | < 992,612,000> | <1,662,441,000> |
| Net Assets | 3,171,330,000 | 3,228,079,000 | 3,291,265,000 |
| Liabilities as % of Net Assets | 7.7% | 30.7% | 50.5% |

45.     On or about March 13, 2008, the Mortgage Advisory Portfolio split into what
MSIM referred to as  "Mortgage Advisory Portfolio"  and "Mortgage Advisory Portfolio II."
NCH remained invested in Mortgage Advisory Portfolio.  The following schedule records the
utilization of TBA transactions to create a position in agency pass-through securities in the
Mortgage Advisory Portfolio at March 31, 2008.

|  | **03/31/08** |
|---|---|
| Total TBA Transactions for Agency Pass-thrus | 1,053,965,000 |
| Total Investments | 2,916,913,000 |
| Liabilities in Excess | |

| | |
|---|---|
| of Other Assets | < 1,022,952,000> |
| Net Assets | 1,893,961,000 |
| Liabilities as % of<br>Net Assets | 54.0% |

### Investment Company Act "Earmarking" Requirement

46.     The Mortgage Advisory Portfolio was an open-end investment company, which was registered with the Securities and Exchange Commission, and which was subject to the requirements of the Investment Company Act of 1940.

47.     As an open-end investment company registered with the Securities and Exchange Commission, the Mortgage Advisory Portfolio was required to earmark liquid securities in the amount of the TBA transactions and maintain liquid securities equal to the amount of the TBA transactions until the liability for such transactions was settled or extinguished.

48.     The requirement to earmark and maintain liquid securities in the amount of the TBA transactions restricted the ability of MSIM to liquidate securities and manage the risk of ownership of the assets in the Mortgage Advisory Portfolio, including the securities identified as "Other Mortgages" which caused the losses in the Mortgage Advisory Portfolio.

### Disclosure of "Agency Pass-thru" Assets While
### Concealing Exposure to "Other Mortgage" Assets

49.     The following schedule records the valuation of the "Agency" and "Non-Agency" assets held in the Mortgage Advisory Portfolio at respective quarter-ends from June 30, 2007 through December 31, 2007.

| | **06/30/07** | **09/30/07** | **12/31/07** |
|---|---|---|---|
| Agency Adjustable Rate | 179,102,000 | 181,660,000 | 158,964,000 |
| Agency Fixed Rate - TBA<br>Transactions | 159,071,000 | 1,004,508,000 | 1,605,078,000 |

| | | | |
|---|---|---|---|
| Agency Fixed Rate - Non-TBA Transactions | 594,086,000 | 568,182,000 | 656.178,000 |
| CMO - Agency Collateral | 48,889,000 | 47,160,000 | 45,072,000 |
| CMO - Non-Agency Collateral | 235,426,000 | 459,698,000 | 583,779,000 |
| Non-Agency "Other Mortgages" | 1,596,722,000 | 1,580,010,000 | 1,634,753,000 |

50.     At June 30, 2007, the Agency-related investments held by the Mortgage Advisory Portfolio in the aggregate amount of $ 981,148,000, constituted approximately 28.7% of the total investments of the Mortgage Advisory Portfolio.

51.     At June 30, 2007, the CMOs backed by non-agency collateral and the non-agency "Other Mortgages" held by the Mortgage Advisory Portfolio in the aggregate amount of $1,832,148,000, constituted approximately 53.6% of the total investments of the Mortgage Advisory Portfolio.

52.     In its Asset Composition report to NCH at June 30, 2007, MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 54.7% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 1.1% |
| Mortgages - Prepayment Sensitive | 2.1% |
| Mortgages - Agency Pass-thru | 9.2% |
| Mortgages - Other Mortgages | 1.2% |
| Cash and Equivalents | 43.2% |
| Cash and Equivalents - owned directly | < 0.5%> |
| | 56.3% |

53.     At September 30, 2007, the Agency-related investments held by the Mortgage Advisory Portfolio in the aggregate amount of $ 1,754,350,000 constituted approximately 41.5% of the total investments of the  Mortgage Advisory Portfolio.

54.     At September 30, 2007, the  CMOs backed by non-agency collateral and the non-agency "Other Mortgages" held by the Mortgage Advisory Portfolio in the aggregate amount of $2,039,708,000 constituted approximately 48.3% of the total investments of the Mortgage Advisory Portfolio.

55.     In its Asset Composition report to NCH at September 30, 2007, MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 51.06% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of  NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 4.6% |
| Mortgages - Prepayment Sensitive | 1.8% |
| Mortgages - Agency Pass-thru | 22.7% |
| Mortgages - Other Mortgages | 1.4% |
| Cash and Equivalents | 24.4% |
| Cash and Equivalents - owned directly | < 2.3%> |
| | 52.6% |

56.     At December 31, 2007, the Agency-related investments held by the Mortgage Advisory Portfolio in the aggregate amount of $ 2,420,220,000 constituted approximately 48.8% of the total investments of the  Mortgage Advisory Portfolio.  Of this amount, a total of $1,605,078 were TBA transactions for which the Mortgage Advisory Portfolio had a corresponding payment liability.

57.     At December 31, 2007, the  CMOs backed by non-Agency collateral and the non-Agency "Other Mortgages" held by the Mortgage Advisory Portfolio  in the aggregate amount of

$2,218,532,000 constituted approximately 44.7% of the total investments of the Mortgage Advisory Portfolio. These securities were fully-paid.

58.     In its Asset Composition report to NCH at December 31, 2007 MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 54.79% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 7.9% |
| Mortgages - Prepayment Sensitive | 2.1% |
| Mortgages - Agency Pass-thru | 34.2% |
| Mortgages - Other Mortgages | 9.4% |
| Cash and Equivalents | 4.8% |
| Cash and Equivalents - Owned Directly | < 2.0%> |
| | 56.4% |

59.     In its Asset Composition report to NCH at January 31, 2008, MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 54.64% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 8.8% |
| Mortgages - Prepayment Sensitive | 2.1% |
| Mortgages - Agency Pass-thru | 33.0% |
| Mortgages - Other Mortgages | 9.1% |
| Cash and Equivalents | 5.8% |
| Cash and Equivalents - Owned Directly | < 2.3%> |
| | 56.5% |

60.. In its Asset Composition report to NCH at February 29, 2008, MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 53.55% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 8.2% |
| Mortgages - Prepayment Sensitive | 2.1% |
| Mortgages - Agency Pass-thru | 35.0% |
| Mortgages - Other Mortgages | 8.1% |
| Cash and Equivalents | 7.8% |
| Cash and Equivalents - Owned Directly | < 5.9%> |
| | 55.3% |

61. The following schedule records the valuation of the "Agency" and "Non-Agency" assets held in the Mortgage Advisory Portfolio at March 31, 2008.

| | 03/31/08 |
|---|---|
| Agency Adjustable Rate | 104,210,000 |
| Agency Fixed Rate - TBA Transactions | 1,053,965,000 |
| Agency Fixed Rate - Non-TBA Transactions | 386,260,000 |
| CMO - Agency Collateral | 33,427,000 |
| CMO - Non-Agency Collateral | 401,860,000 |
| "Other Mortgages" | 681,410,000 |

62. At March 31, 2008, the Agency-related investments held by the Mortgage Advisory Portfolio in the aggregate amount of $ 1,577,862,000 constituted approximately 53.4% of the total investments of the Mortgage Advisory Portfolio.

63.    At March 31, 2008, the CMOs backed by non-agency collateral and the non-agency "Other Mortgages" held by the Mortgage Advisory Portfolio in the aggregate amount of $1,083,270,000 constituted approximately 37.1% of the total investments of the Mortgage Advisory Portfolio.

64.    In its Asset Composition report to NCH at March 31, 2008 MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 54.81% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
| --- | --- |
| Commercial Mortgage-Backed Sec. | 9.0% |
| Mortgages - Prepayment Sensitive | 2.2% |
| Mortgages - Agency Pass-thru | 37.6% |
| Mortgages - Other Mortgages | 6.4% |
| Cash and Equivalents | 9.0% |
| Cash and Equivalents - Owned Directly | < 7.4%> |
|  | 56.8% |

65.    In its Asset Composition report to NCH at April 30, 2008, MSIM allocated the NCH investment in the Mortgage Advisory Portfolio, which represented 55.02% of the value of the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
| --- | --- |
| Commercial Mortgage-Backed Sec. | 8.2% |
| Mortgages - Prepayment Sensitive | 2.1% |
| Mortgages - Agency Pass-thru | 35.4% |
| Mortgages - Other Mortgages | 6.3% |
| Cash and Equivalents | 12.9% |
| Cash and Equivalents - Owned Directly | < 7.9%> |
|  | 57.0% |

66.     In its Asset Composition report to NCH at May 31, 2008, MSIM allocated the

NCH investment in the Mortgage Advisory Portfolio, which represented 55.28% of the value of

the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 7.7% |
| Mortgages - Prepayment Sensitive | 2.1% |
| Mortgages - Agency Pass-thru | 33.1% |
| Mortgages - Other Mortgages | 5.7% |
| Cash and Equivalents | 15.7% |
| Cash and Equivalents - Owned Directly | < 7.1%> |
| | 57.2% |

67.     In its Asset Composition report to NCH at June 30, 2008, MSIM allocated the

NCH investment in the Mortgage Advisory Portfolio, which represented 54.04% of the value of

the total fixed income portfolio, within the following asset categories and percentages:

| Asset Category | Percentage of NCH Fixed Income Portfolio |
|---|---|
| Commercial Mortgage-Backed Sec. | 7.0% |
| Mortgages - Prepayment Sensitive | 1.9% |
| Mortgages - Agency Pass-thru | 33.5% |
| Mortgages - Other Mortgages | 6.5% |
| Cash and Equivalents | 13.9% |
| Cash and Equivalents - Owned Directly | < 6.7%> |
| | 56.1% |

68.     In each Asset Composition report by MSIM to NCH from December 31, 2007

through June 30, 2008, MSIM failed to disclose to NCH the extent of the exposure of the NCH

fixed income fund to non-agency securities backed by MTA option ARM mortgages of Alt-A

borrowers. The losses experienced in the fixed income fund were directly caused by the decline

in value of non-agency securities backed by MTA option ARM mortgages of Alt-A borrowers.

## Change by MSIM in Reporting Asset Composition

69.  MSIM changed the content and format of its Asset Composition report in its report to NCH for July 31, 2008.  The Asset Composition report for July 31, 2008 was received after NCH directed MSIM to sell the entire position of approximately $24 million in the Mortgage Advisory Portfolio.

70..    With respect to the composition of the "Mortgage" component of the Asset Composition report for the  fixed income portfolio, albeit belatedly, MSIM made the following changes to provide the necessary material disclosure concerning the actual composition of the mortgage portfolio in the Mortgage Advisory Portfolio.

### Categories of "Mortgage" Component
### of MSIM Asset Composition Report

| Prior to 07/31/2008 Report | 07/31/2008 Report |
|---|---|
| Prepayment Sensitive | Prepayment Sensitive |
| Agency Pass-thrus | N/A |
| Other Mortgages | Other Mortgages |
|  | Agency ARMs |
|  | Agency CMOs |
|  | Agency Fixed Rate Pools |
|  | Agency Fixed Rate TBAs |
|  | Agency Hybrid ARMs |
|  | Non-Agency Fixed Rates |
|  | Non-Agency Hybrid ARMs |
|  | Non-Agency Option ARMs |

71.    With respect to the composition of the "Cash and Equivalents" component of the Asset Composition report for the fixed income portfolio, MSIM made the following changes to provide the necessary, material disclosures of the actual composition of the "Cash and Equivalents" assets.

### Categories of "Cash and Equivalents" Component
### of MSIM Report of Asset Composition

| Prior to 07/31/2008 Report | 07/31/2008 Report |
|---|---|
| No categories disclosed | Money Market |
| | ABS Floaters |
| | Agency ARMs |
| | Agency CMOs |
| | Agency Floaters |
| | Agency Super Premiums |
| | HEL Floaters |
| | Non-Agency Hybrid ARMs |
| | Non-Agency Option ARMs |

72.     With respect to the disclosure of the use of "TBA" transactions" and the leverage liabilities associated with its use, MSIM changed the Asset Composition report to include the necessary and material disclosure of a mortgage category for "Agency Fixed Rate TBAs" as an asset, and a corresponding liability for "TBA Payable." Prior to changing its Asset Composition report, MSIM made no disclosure in its monthly reporting to NCH of whether and to what extent its assets were subject to liabilities.

### Letter Dated October 22, 2007

73.     In a letter dated October 22, 2007 to NCH which enclosed the Asset Composition and other reports for September 30, 2007, MSIM reported that the mortgage securities which it held as "cash equivalents" had been marked-down to reflect the decline in market value for the securities. MSIM attributed the decline to forced selling by hedge funds in mid-August 2007 in order to meet collateral or withdrawal requirements. MSIM did not disclose the extent of the exposure to these mortgage securities or their composition as securities backed by "Alt-A" mortgages. Alt-A loans required little documentation from the borrower, and were described in the industry as "liar loans."

**Letter Dated January 24, 2008**

74.     In a letter dated January 24, 2008 to NCH which enclosed the Asset Composition and other reports for December 31, 2007, MSIM reported that non-agency mortgages were held in the portfolio and made certain disclosures related to non-agency mortgages. However, MSIM failed to disclose to NCH the actual extent to which its fixed income portfolio was invested in non-agency mortgages, or the fact that the bulk of its non-agency mortgage exposure was in securities backed by mortgages from "Alt-A" borrowers.

75.     The Asset Composition report for December 31, 2007, reported to NCH that 34.7% of its fixed income assets were invested in "Agency Pass-thrus," and made no specific disclosure of any position in "non-agency" mortgages.

76.     By reporting an asset composition of 34.7% of fixed income assets invested in "Agency Pass-thrus" without disclosing the extent of the exposure to non-agency mortgage securities, MSIM created the misleading appearance that the mortgage component of its fixed income portfolio was in line with the mortgage component of the Lehman Brothers Aggregate Bond Index.

77.     In its letter dated January 24, 2008, MSIM reported an "advancing deterioration in the housing markets," and "continued fallout from the subprime situation and resulting liquidity concerns."

78.     With respect to "non-Agency mortgages" held in the portfolio, MSIM reported in its letter dated January 24, 2008 that the "forced selling of these non-Agency MBS visible in the summer continued in the quarter, with large players pushing significant chunks of this debt back into the markets in preparation for year-end." MSIM acknowledged that the selling "drove the prices of all securities of this type lower, regardless of their fundamentals

or credit performance, " and that this "saw prices decline in securities we had already purchased, negatively impacting relative performance."

79.     By reporting an asset composition of 34.7% of NCH's fixed income assets invested in "Agency Pass-thrus" without disclosing the extent of the exposure to non-agency mortgage securities, MSIM failed to disclose the extent to which the fixed income portfolio was exposed to the acknowledged risks of ownership of non-Agency securities.

80.     At December 31, 2007, the Mortgage Advisory Portfolio held non-Agency mortgage securities in the amount of approximately 50% of its net assets.

### Letter Dated April 25, 2008

81.     In a letter to NCH dated April 25, 2008, MSIM reported to NCH that the fixed income portfolio had returned a negative 4.14% in the first quarter of 2008 as compared to the Lehman Aggregate Index which returned a positive 2.17%.   MSIM reported that the decline in value of the  "non-agency" mortgage-backed securities holdings had a "profoundly negative effect on relative performance."

82.     By reporting an asset composition of 37.6% of NCH's fixed income assets invested in "Agency Pass-thrus" without disclosing the extent of the exposure to non-agency mortgage securities, MSIM failed to disclose the extent to which the fixed income portfolio was exposed to the acknowledged risks of ownership of non-Agency securities.

83.     At March 31, 2008, the Mortgage Advisory Portfolio held non-Agency mortgage securities in the amount of approximately 57% of its net assets.

### Letter Dated July 24, 2008

84.     In a letter dated July 24, 2008, MSIM reported to NCH that the fixed income portfolio had returned a negative 3.06% in the second quarter of 2008 as compared to the

Lehman Aggregate Index which returned a negative 1.02%. MSIM reported that "the non-Agency mortgages we own in portfolios were the main driver for our underperformance."

85.    By reporting an asset composition of 33.5% of NCH's fixed income assets invested in "Agency Pass-thrus" without disclosing the extent of the exposure to non-agency mortgage securities, MSIM failed to disclose the extent to which the fixed income portfolio was exposed to the acknowledged risks of ownership of non-Agency securities.

86.    At June 30, 2008, the Mortgage Advisory Portfolio held non-Agency mortgage securities in the amount of approximately 48% of its net assets.

## Representation of "look through" for Mortgage Advisory Portfolio Holdings

87.    On each monthly asset composition report by MSIM to NCH, MSIM represented to NCH that the asset composition reporting included "a look through for any mutual fund holdings."

88.    The asset composition reports for each month from December 31, 2007 through June 30, 2008  contained the representation by MSIM to NCH that the report included "a look through for any mutual fund holdings."

89.    The monthly representations by MSIM to NCH that the asset composition reports included "a look through for any mutual fund holdings" were false and misleading in that the asset composition reports failed to disclose the fact of and the extent to which the asset composition included positions in non-agency mortgage backed securities.

90.    The monthly representations by MSIM to NCH that the asset composition reports included "a look through for any mutual fund holdings" were false and misleading in that the asset composition reports included material positions in "Agency Pass-thrus" without

disclosing that the "Agency Pass-thrus" had not been paid for or the extent of the liability related to the "Agency Pass-thru" positions reported to NCH.

## Purchases of Units in Mortgage Advisory Portfolio

91.     On December 7, 2007, MSIM caused the NCH fixed income portfolio to purchase an additional 135,575.56 units of the Mortgage Advisory Portfolio at 9.22/unit for an aggregate cost to NCH of $1,250,006.   After this purchase, the fixed income portfolio owned approximately 3,061,390 units of the Mortgage Advisory Portfolio.

92.     On March 13, 2008, MSIM caused the NCH fixed income portfolio to purchase an additional 178,710 units of the Mortgage Advisory Portfolio at 8.24/unit for an aggregate cost to NCH of $1,472,571.  After  this purchase, the fixed income portfolio owned approximately 3,289,617 units of the Mortgage Advisory Portfolio.

93.     During the period from September 30, 2007 to August 14, 2008, MSIM caused the NCH fixed income portfolio to purchase additional units of the Mortgage Advisory Portfolio through reinvestment of dividends or interest from the Mortgage Advisory Portfolio.  During the  period, a total of 173,935 units were purchased through reinvestment of approximately $1,455,889.

## Count I - Section 215 of the Investment Advisers Act of 1940
### (15 U.S. C. Section 80b-14)

94.     Plaintiff, NCH realleges and thereby incorporates by reference the allegations in paragraph 1 to 93 above.

95.     At all relevant times, MSIM was a investment adviser registered with the U.S. Securities and Exchange Commission.

96.     At all relevant times,  MSIM provided investment advisory services pursuant to a contract between NCH and MSIM.

97.     During the period from September 30, 2007 through on or about August 12, 2008, the performance of the investment advisory contract involved MSIM engaging in practices and courses of business which operated as a fraud and deceit upon NCH, in violation of Section 206(2) of the Investment Advisers Act of 1940, 15 U.S. C. Section 80-b6(2).

98.     The practices and courses of business engaged in by MSIM which operated as a fraud and deceit upon NCH during the period from September 30, 2007 through August 12, 2008, were:

  a.     the concealment from NCH by MSIM of the extent to which the fixed income assets of NCH were invested in mortgage securities backed by non-agency, moving treasury average option ARM mortgages of Alt-A borrowers;

  b.     the misrepresentation by MSIM to NCH of the extent to which the fixed income assets of NCH were invested in agency pass-thru securities;

  c.     the failure by MSIM to disclose to NCH the extent to which the fixed income assets of NCH were subject to the liabilities resulting from the employment of TBA transactions and a TBA roll procedure by MSIM in its capacity as the investment adviser to the Mortgage Advisory Portfolio;

  d.     The failure by MSIM to disclose to NCH the risks associated with the requirement by MSIM, in its capacity as the investment adviser to the Mortgage Advisory Portfolio, to maintain liquid assets in the amount of any and all TBA liabilities which restricted the ability of MSIM to manage the assets held in the Mortgage Advisory Portfolio;

  e.     The failure by MSIM to disclose the extent to which the composition of the mortgage investments for the NCH fixed income fund managed by MSIM, deviated from the composition of the mortgage portfolio in the Lehman Aggregate Bond Index; and

  f.     The representation that the monthly Asset Composition reports included "a look through for an mutual fund holdings."

99.     In Count I, NCH seeks the disgorgement from MSIM of the amount of advisory fees and any other compensation received by it pursuant to the investment advisory contract during the period from and after September 30, 2007.

## Count II - Breaches of Fiduciary Duty

100.    Plaintiff, NCH realleges and thereby incorporates by reference the allegations in paragraph 1 to 93 above.

101.    NCH had an investment advisory contract with MSIM because MSIM had vastly greater knowledge and expertise concerning the investment of assets for fixed income than did NCH.

102.    Pursuant to the investment advisory contract between MSIM and NCH, MSIM had discretion to exercise its own judgment in making sales, exchanges, investments or reinvestments, subject to the investment objectives and guidelines of NCH.

103.    MSIM placed its trust and confidence in MSIM.

104.    MSIM and NCH had a fiduciary relationship in which MSIM had a fiduciary duty to NCH to act with utmost candor, care, loyalty and good faith.

105.    MSIM breached its fiduciary duty to NCH by:

        a.      concealing from NCH the extent to which the fixed income assets of NCH were invested in mortgage securities backed by non-agency, moving treasury average option ARM mortgages of Alt-A borrowers;

        b.      misrepresenting to NCH the extent to which the fixed income assets of NCH were invested in agency pass-thru securities;

        c.      failing to disclose to NCH the extent to which the fixed income assets of NCH were subject to the liabilities resulting from the employment of TBA transactions and a TBA roll procedure by MSIM in its capacity as the investment adviser to the Mortgage Advisory Portfolio;

        d.      failing to disclose to NCH the risks associated with therequirement by MSIM, in its capacity as the investment adviser to the Mortgage Advisory Portfolio, to maintain liquid assets in the amount of any and all TBA liabilities which restricted the ability of MSIM to manage the assets held in the Mortgage Advisory Portfolio;

        e.      failing to disclose to NCH the extent to which the composition of the mortgage investments for the NCH fixed income fund managed by MSIM, deviated from the composition of the mortgage portfolio in the Lehman Aggregate Bond Index; and

f.    representing that the monthly Asset Composition reports included "a look through for an mutual fund holdings."

106.    As a result of the breaches of fiduciary duty, NCH continued its fiduciary relationship with MSIM which it would otherwise have terminated had it known of the concealed facts and misrepresentations.

107.    As a result of the breaches of fiduciary duty, NCH maintained its investment in the Mortgage Advisory Portfolio which it would otherwise have terminated had it known of the concealed facts and misrepresentations.

108.    MSIM's breaches of fiduciary duty caused substantial damages to NCH in an amount to be determined at trial, but in no event less than $7 million exclusive of costs and interest.

### Count III - Breach of Contract

109    Plaintiff, NCH realleges and thereby incorporates by reference the allegations in paragraph 1 to 93  above.

110.    NCH and MSIM had a valid and enforceable contract for the provision of investment advisory and other services.

### A.  Breach for Misrepresentations and Concealment

111.    The contract, among other things, provided as follows with respect to the contractual requirements of MSIM:

> "We will report periodically to the Investment Committee with respect to our management of the securities held in the portfolio and will provide any such periodical or special reports as may be reasonably requested, including monthly statements, changes in assets, and current market appraisals.  We will advise you promptly of changes as they are made in the portfolio."

27

112     MSIM breached the contract by providing monthly reports and quarterly letters

which misrepresented and concealed the investments in the fixed income portfolio by:

        a.      concealing from NCH the extent to which the fixed income assets of NCH were invested in mortgage securities backed by non-agency, moving treasury average option ARM mortgages of Alt-A borrowers;

        b.      misrepresenting to NCH the extent to which the fixed income assets of NCH were invested in agency pass-thru securities;

        c.      failing to disclose to NCH the extent to which the fixed income assets of NCH were subject to the liabilities resulting from the employment of TBA transactions and a TBA roll procedure by MSIM in its capacity as the investment adviser to the Mortgage Advisory Portfolio;

        d.      failing to disclose to NCH the risks associated with the requirement by MSIM, in its capacity as the investment adviser to the Mortgage Advisory Portfolio, to maintain liquid assets in the amount of any and all TBA liabilities which restricted the ability of MSIM to manage the assets held in the Mortgage Advisory Portfolio;

        e.      failing to disclose to NCH the extent to which the composition of the mortgage investments for the NCH fixed income fund managed by MSIM, deviated from the composition of the mortgage portfolio in the Lehman Aggregate Bond Index; and

        f.      representing that the monthly Asset Composition reports included "a look through for an mutual fund holdings."

## B. Breach for Use of Derivatives to Leverage Portfolio

113.     The contract, among other things, provided as follows:

> "We will constantly review the securities held in the portfolio and in accordance with our own judgment and discretion, but subject to a statement of Investment Objectives and Guidelines set forth from time to time by the Investment Committee, will make sales, exchanges, investments or reinvestments or take any action which we deem necessary of desirable in connection with the securities held in the portfolio."

114.     The Investment Objectives and Guidelines of NCH prohibited the use of

derivatives to leverage the portfolio.

115.     TBA transactions were a form of derivative security.

116.    The use of TBA transactions leveraged the mortgage portfolio of the Mortgage

Advisory Portfolio by permitting an exposure to the ownership of mortgage securities in

excess of the net assets of the Mortgage Advisory Portfolio. As a result, NCH's fixed income

portfolio of which more than fifty percent (50%) was in units of the Mortgage Advisory

Portfolio, was exposed to the risks created by the use of leverage in the Mortgage Advisory

Portfolio.

117.    The use of leverage in the Mortgage Advisory Portfolio resulted in the acquisition

of TBA positions in Agency pass-through mortgage securities, and the maintenance of

positions in non-Agency mortgage securities, which were concentrated in  Collateralized

Mortgage Obligations backed by MTA Option ARM mortgages of Alt-A borrowers.

118.    At December 31, 2007, the Mortgage Advisory Portfolio held net assets of

$3,291,265,000 with liabilities from TBA transactions of $1,605,078,000 and non-Agency

mortgage investments concentrated in Collateralized Mortgage Obligations backed by MTA

Option ARM mortgages of Alt-A borrowers of at least $1,634,753,000.

119.    From December 31, 2007 through August 12, 2008, MSIM breached the contract

by permitting and authorizing the use of derivatives to leverage the NCH fixed income

portfolio exposure to agency and non-agency mortgage securities.

### C.  Breach for Violating Guidelines on Exposure to Risk

120.    By letter dated October 1, 1996  from Miller, Anderson & Sherred, then owned by

a division of Morgan Stanley,  NCH was advised  that no derivatives in the form of

mortgage-backed securities would be purchased " which would create an exposure to

mortgage prepayments or other risk exposures outside the normal range as contemplated by

these guidelines."

121. By letter dated October 18, 1996, NCH advised Miller, Anderson & Sherred that the letter dated October 1, 1996 as it related to the use of derivatives in the form of mortgage-backed securities, among other things, was acceptable as within the existing investment policies and guidelines of NCH.

122. The non-Agency mortgage-backed securities held in the Mortgage Advisory Portfolio in the first quarter of 2008, were concentrated in Collateralized Mortgage Obligations backed by MTA option ARM mortgages of Alt-A borrowers. In a letter dated April 25, 2008, MSIM acknowledged that the "variables we examine when determining fundamental value in MTA Option ARM CMOs are: Prepayments, Default Rates, and Loss Severity." In the letter dated April 25, 2008, MSIM further acknowledged the following:

a. that the market for non-Agency MBS securities was in "disarray" during the first quarter of 2008;

b. the non-Agency MBS market was under "significant strain" with a "challenging liquidity dynamic" during the first quarter of 2008;"

c. there was a "declining climate for residential real estate;"

d. the market pricing was consistent with a 100% default rate when adjustable mortgages "recast," which represented an over-all default rate of 70% of all mortgages in the non-Agency mortgage pools backing the MBS securities.

123. From December 31, 2007 through August 12, 2008, MSIM breached the contract by maintaining the exposure of the NCH fixed income portfolio to the risks of the non-Agency Collateralized Mortgage Obligations backed by MTA Option ARM CMOs held in the Mortgage Advisory Portfolio.

124. On March 13, 2008, MSIM breached the contract by adding to the exposure of the NCH fixed income portfolio to the risks of the non-Agency Collateralized Mortgage Obligations

backed by MTA Option ARM CMOs by purchasing 178,710 units of the Mortgage Advisory Portfolio at 8.24/unit for an aggregate cost to NCH of $1,472,571.

125.    NCH performed its obligations required by the contract.

126.    As a result of the contract breaches by MSIM, NCH was damaged in an amount to be determined at trial, but in no event less than $7 million exclusive of interest and costs.

### Count IV - Negligent Misrepresentation

127.    Plaintiff, NCH realleges and thereby incorporates by reference the allegations in paragraph 1 to 93 above.

128.    MSIM is in the business of providing investment advisory services and reporting information concerning the performance of those services to clients, including NCH.

129.    The reporting to clients of information is not incidental to, but is an integral part of the business of MSIM.

130.    In connection with its business of reporting information to NCH, MSIM was under a contractual duty, a common-law fiduciary duty and a statutory duty as a registered investment adviser, to communicate accurate information.

131.    In its reports of information to NCH during the period from September 30, 2007 through August 12, 2008, MSIM failed to provide NCH with accurate information by making misrepresentations and omitting material, necessary facts involving:

a.    the concealment from NCH by MSIM of the extent to which the fixed income assets of NCH were invested in mortgage securities backed by non-agency, moving treasury average option ARM mortgages of Alt-A borrowers;

b.    the misrepresentation by MSIM to NCH of the extent to which the fixed income assets of NCH were invested in agency pass-thru securities;

c.    the failure by MSIM to disclose to NCH the extent to which the fixed income assets of NCH were subject to the liabilities resulting from the employment of TBA

transactions and a TBA roll procedure by MSIM in its capacity as the investment adviser to the Mortgage Advisory Portfolio;

    d.    the failure by MSIM to disclose to NCH the risks associated with the requirement by MSIM, in its capacity as the investment adviser to the Mortgage Advisory Portfolio, to maintain liquid assets in the amount of any and all TBA liabilities which restricted the ability of MSIM to manage the assets held in the Mortgage Advisory Portfolio;

    e.    the failure by MSIM to disclose the extent to which the composition of the mortgage investments for the NCH fixed income fund managed by MSIM, deviated from the composition of the mortgage portfolio in the Lehman Aggregate Bond Index; and

    f.    The representation that the monthly Asset Composition reports included "a look through for an mutual fund holdings."

132.    MSIM was negligent in ascertaining the true facts, and was negligent in reporting misrepresentations to NCH and in failing to disclose to NCH material information.

133.    In its reporting of information to NCH, MSIM intended to induce NCH to continue to repose trust and confidence in MSIM, and to continue its contractual relationship with MSIM as its investment adviser.

134.    NCH relied on the reports of information received from MSIM to be accurate and complete, and based on that reliance continued its retention of MSIM as investment adviser.

135.    In its reporting to NCH, MSIM intended to induce NCH to maintain its investment in the Mortgage Advisory Portfolio for which MSIM also served as investment adviser.

136.    NCH relied on the reports of information received from MSIM to be accurate and complete concerning the investment by NCH in units of the Mortgage Advisory Portfolio. Based on that reliance, NCH maintained its position in the units of the Mortgage Advisory Portfolio.

137.    As a result of its reliance on the information received from MSIM, NCH was damaged in an amount to be determined at trial, but in no event by less than $7 million, exclusive of interest and costs.

## Count V - Illinois Securities Act

138.    Plaintiff, NCH realleges and thereby incorporates by reference the allegations in paragraph 1 to 93 above.

139.    MSIM is registered as an investment adviser under the Investment Advisers Act of 1940.

140.    During the period from September 30, 2007 through August 12, 2008, MSIM engaged in practices and courses of business which operated as a fraud and deceit upon NCH, in violation of Section 12.J(2) of the Illinois Securities Law, 815 ILCS 5/12.J.

141.    The practices and courses of business engaged in by MSIM which operated as a fraud and deceit upon NCH during the period from September 30, 2007 through August 12, 2008, were:

   a.    the concealment from NCH by MSIM of the extent to which the fixed income assets of NCH were invested in mortgage securities backed by non-agency, moving treasury average option ARM mortgages of Alt-A borrowers;

   b.    the misrepresentation by MSIM to NCH of the extent to which the fixed income assets of NCH were invested in agency pass-thru securities;

   c.    the failure by MSIM to disclose to NCH the extent to which the fixed income assets of NCH were subject to the liabilities resulting from the employment of TBA transactions and a TBA roll procedure by MSIM in its capacity as the investment adviser to the Mortgage Advisory Portfolio;

   d.    The failure by MSIM to disclose to NCH the risks associated with the requirement by MSIM, in its capacity as the investment adviser to the Mortgage Advisory Portfolio, to maintain liquid assets in the amount of any and all TBA liabilities which restricted the ability of MSIM to manage the assets held in the Mortgage Advisory Portfolio;

e.      The failure by MSIM to disclose the extent to which the composition of the mortgage investments for the NCH fixed income fund managed by MSIM, deviated from the composition of the mortgage portfolio in the Lehman Aggregate Bond Index; and

f.      The representation that the monthly Asset Composition reports included "a look through for an mutual fund holdings."

142.    NCH relied on the reports of information from MSIM to be accurate and complete.  As a result of this reliance, MSIM remained a client of MSIM throughout the period from September 30, 2007 through August 12, 2008.

143.    The practices and courses of business engaged in by MSIM operated to fraudulently induce NCH to remain as an advisory client of NCH.

144.    During the period from September 30, 2007 through August 12, 2008, MSIM exercised its authority from NCH and purchased for NCH in transactions of December 7, 2007 and March 13, 2008, a total of 314.285 units in the Mortgage Advisory Portfolio for an aggregate cost of approximately $2,722,577.

145.    During the period from September 30, 2007 through August 12, 2008, MSIM exercised its authority from NCH for the reinvestment of income from NCH's investment in the Mortgage Advisory Portfolio, and purchased for NCH a total of 173,935 units in the Mortgage Advisory Portfolio for an aggregate cost of approximately $1,455,889.

146.    The sales of units were made in violation of Section 12.J(2) of the Illinois Securities Law, 815 ILCS 5/12.J(2) because, but for the fraudulent inducement of NCH to remain a client of MSIM, the sales would not have been effected for the fixed income account of NCH.

147.    MSIM was a person by which the sales made.

148.    MSIM sold the units on August 12, 2008.

149.    By letter transmitted by certified mail on March 16, 2009 and received by MSIM on March 20, 2009, NCH demanded rescission of the sales of the units of the Mortgage Advisory Portfolio.

150.    MSIM is liable for the amounts set forth in Section 13.A.(2) of the Illinois Securities Law, 815 ILCS 5/13.A(2), which amounts will be established at trial, but which shall not be less than (i) $945,437, which is the realized loss plus interest at 10% through December 31, 2008, plus (ii) interest at 10% on $945,437 from January 1, 2009, plus (iii) costs and reasonable fees and expenses of NCH's attorneys in this matter.

## Count VI - Violation of Illinois Consumer Fraud Act

151.    Plaintiff, NCH realleges and thereby incorporates by reference the allegations in paragraph 1 to 93 above.

152.    MSIM engaged in deceptive acts and practices within the meaning of the Illinois Consumer Fraud Act, 815 ILCS 505/2. These deceptive practices included the misrepresentations and misconduct described above, including those alleged in Paragraph 141.

153.    MSIM's deception and misconduct occurred in the course of conduct involving trade and commerce.

154.    MSIM's misconduct is the proximate cause of injuries sustained by NCH, which qualifies as a consumer within the meaning of the Illinois Consumer Fraud Act.

155.    MSIM is liable under the ILCFA for an amount in excess of $7.0 million and is liable for NCH's costs and expenses incurred in connection with this action, including reasonable attorneys' fees pursuant to 815 ILCS 505/10A.

Dated:        June 9, 2010

Respectfully submitted,

One of the Attorneys for Plaintiff,
Northwest Community Healthcare

Peter B. Shaeffer
30 N. LaSalle Street – Ste # 2140
Chicago, Illinois 60602
Tel: 312-782-5306
Fax: 312-201-4559
Attorney No. – 3121472

Andrew Staes
Stephen Scallan
Staes & Scallan, P.C.
111 W. Washington – Ste #1631
Chicago, Illinois 60602
Tel: 312-201-8969
Fax: 312-201-9233